584 A.2d 390

**Thomas SERTIK, Petitioner,**

v.

**The SCHOOL DISTRICT OF PITTSBURGH, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 4, 1990.

Decided Dec. 12, 1990.

John A. Bacharach, Bacharach & Klein, Pittsburgh, for petitioner.

Bruce D. Campbell, Meyer, Darragh, Buckler, Bebenek, Eck and Hall, Pittsburgh, for respondent.

Before McGINLEY and KELLEY, JJ., and BARRY, Senior Judge.

McGINLEY, Judge.

Thomas Sertik (Sertik) petitions for review of an order of the Secretary of Education (Secretary) dismissing his appeal from a decision of the Board of School Directors (Board) of the School District of Pittsburgh (School District). The issues presented for our review are whether Sertik's dismissal was based upon evidence that was obtained as a result of unlawful police conduct in which the School District was an active participant; whether the Board could rely on Sertik's alleged admission of sexual conduct if the inculpatory admissions were involuntary; and whether the Board improperly based its adjudication of Sertik's sexual activity solely on uncorroborated hearsay. We affirm.

On September 21, 1989, Christopher T. Kelly (Kelly), Chief of Police for Baldwin Borough, discovered Sertik, a teacher at Carrick High School (Carrick), which is located

within the School District, and Tammy E. (Tammy), an eighteen-year old who graduated from Carrick in June of 1989, possibly engaged in sexual activity in Sertik's parked car. Suspecting an act of prostitution, Kelly approached the vehicle and asked Tammy her age. Tammy replied that she was twenty-three. Kelly asked for identification and obtained Tammy's driver's license which indicated that she was only eighteen. At this point, Tammy started crying and said "please don't call my mother ... he's my teacher." Kelly first called for additional officers and told Tammy to stand at the rear of the vehicle. Kelly then questioned Sertik who sought permission for them to leave and stated that they were both adults and were in love.

Subsequently, Kelly talked again with Tammy who stated that her affair with Sertik had been going on since she was a senior at Carrick. Tammy further stated that they had intercourse during the school year while on a trip to Seven Springs Resort. Kelly and the other officers then transported Sertik and Tammy to the Baldwin police station in separate vehicles.

At the police station, Kelly called the School District's Chief of Security who, in turn, called Dr. Brian White (White), Carrick's Principal, and Ron Mancini (Mancini) an investigator for the School District. Kelly also informed Sertik and Tammy of their *Miranda*[1] rights. Both signed waiver forms and agreed to talk with Kelly and Mancini. Sertik declined to have an attorney or union representative present.

Tammy and Sertik were questioned separately. Both admitted to having a sexual relationship during the last semester of Tammy's senior year and beyond Tammy's June 1989 graduation. Later that evening, White informed Sertik not to report to class the next day, but to go instead to the School District's Administration Building. The next day, Sertik appeared as requested and was suspended.

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

By letter dated October 4, 1989, Sertik was informed that the School District had recommended to the Board that he be dismissed from his employment. A copy of the charges against Sertik was attached. The School District charged: 1) that Sertik repeatedly transported Tammy in his car to her home after school and to Seven Springs Ski Resort without authorization from school authorities in violation of School District policies regarding transportation of students and contacts with students; 2) that Sertik had engaged in immoral behavior by having sexual intercourse with Tammy during the second semester of the 1988–89 school year; and 3) that such an amorous relationship was in violation of established School District policy.

On October 30, 1989, a hearing on the charges was held before Board Member Ronald Suber (Suber). At the hearing, Richard C. Wallace, Jr., School District Superintendent, Tammy's father, Kelly, Mancini, White, Sertik and Tammy all testified. At the conclusion of the hearing, the parties agreed to waive closing arguments and submit briefs to the Board. The other Board members reviewed the record of the hearing before Suber and found that the evidence supported the School District's charges. On November 22, 1989, the Board voted to dismiss Sertik. On December 13, 1989 Sertik appealed to the Secretary. On April 23, 1990, the Secretary dismissed Sertik's appeal. Sertik subsequently appealed to this Court. Our scope of review where the Secretary has taken no additional evidence is limited to a determination of whether constitutional rights have been violated, whether an error of law has been committed or whether the necessary findings of fact are supported by substantial evidence. *Bravo v. Board of Directors of the Wellsboro Area School District*, 95 Pa. Commonwealth Ct. 71, 504 A.2d 418 (1986).

Sertik's first contention is that the evidence of his alleged sexual relationship with Tammy introduced at the Board hearing must be excluded because it was obtained as a result of an illegal stop, illegal arrest, illegal search, and an illegal interrogation in which the School District was an

active participant. Similarly, Sertik's second contention is that his alleged admission of sexual activity made to Kelly, White and Mancini at the police station was involuntary and cannot be used against him.

Initially, we note that in *DeShields v. Chester Upland School District*, 95 Pa.Commonwealth Ct. 414, 505 A.2d 1080 (1986), which we find to be controlling, this Court addressed an issue identical to the one presently before us. We adopted a balancing test first enunciated by the United States Supreme Court in *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) to determine whether the exclusionary rule established in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) should be applied to civil administrative proceedings. In *DeShields*, we stated:

> The legal issue presented by Appellant in this case is whether the exclusionary rule enunciated in *Mapp v. Ohio*, 367 U.S. 643[, 81 S.Ct. 1684, 6 L.Ed.2d 1081] (1961), should be applied to a civil administrative hearing relating to the suspension or discharge of a public school employee. This Court has examined a similar issue in *Kleschick v. Civil Service Commission*, 27 Pa.Commonwealth Ct. 125, 365 A.2d 700 (1976), where we held that the exclusionary rule was not applicable to a determination of whether back pay should be granted to a reinstated Philadelphia civil service employee. In *Kleschick*, however, we specifically declined to decide whether the *Mapp* rule would be at all applicable to dismissal proceedings. *Id.*, 27 Pa.Commonwealth Ct. at 126, 365 A.2d at 701.
>
> Since *Kleschick* was decided, the United States Supreme Court has also considered the issue of the applicability of the *Mapp* rule in a civil context. In *United States v. Janis*, 428 U.S. 433[, 96 S.Ct. 3021, 49 L.Ed.2d 1046] (1976), the Supreme Court held that evidence illegally seized by state narcotics agents could be used as evidence in a federal tax proceeding. Although the holding in *Janis* was dependent in part on the fact that agencies of separate sovereigns were involved, the appli-

cability of *Janis* was later expanded by *Immigration and Naturalization Service v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479[, 82 L.Ed.2d 778] (1984). In *Lopez–Mendoza,* the Supreme Court was faced with the question of whether evidence obtained unlawfully by the Federal Immigration Service could be used by the same agency in a civil deportation proceeding. In reaching its conclusion, the court referred to its *Janis* decision as setting forth a framework for deciding in what types of proceedings the application of the exclusionary rule is appropriate. As the Court stated:

> the Court recognized in *Janis* that there is no choice but to weigh the likely social benefits of excluding unlawfully seized evidence against the likely costs. On the benefit side of the balance 'the "prime purpose" of the [exclusionary] rule if not the sole one "is to deter future unlawful police conduct." ' . . . On the cost side there is the loss of often probative evidence and all of the secondary costs that flow from the less accurate or more cumbersome adjudication that therefore occurs.

*Id.* at 1045, 104 S.Ct. at 3486 (citations omitted.) The Court noted that in *Janis* the deterrent effect of the rule was slight, since the state law enforcement personnel were already "punished" by the exclusion of the evidence in the criminal trial. While the *Lopez–Mendoza* court acknowledged that the exclusionary rule is likely to be more effective in "intrasovereign" violations such as occurred in *Janis,* it nonetheless found other factors which indicated that the application of the exclusionary rule in civil proceedings before the immigration agency would not deter future illegal conduct by that same agency. *Id.* at 1045–46, 104 S.Ct. at 3486–87. Thus, the Court declined to apply the rule. *Id.* at 1054, 104 S.Ct. at 3491.

Applying the *Janis* balancing approach in this case, we have no difficulty concluding that the exclusionary rule should not be applied to this civil proceeding. Although the Chester City police department and the Chester Upland School District are both allied local agencies of the

same sovereign, they have no formal relationship with each other, and are not in any way involved in, or responsible for, one another's operations. Thus, the suppression of the evidence in the School District's termination hearing will have little effect in deterring the police department from future illegal conduct. In addition, as was noted in *Janis*, the police department has already been "punished" by the exclusion of the evidence in the criminal proceeding. On the cost side, the School District's interest in protecting its students and insuring a safe school environment would be jeopardized by the exclusion of evidence concerning serious misconduct by its employees. On the balancing scale therefore, it is clear that what slight deterrent effect an exclusion of evidence would have is far outweighed by the costs to society in restricting a school district in its efforts to secure the safety of our public schools. Thus we must conclude that, on the basis of *Janis*, the evidence was properly admitted into evidence despite the fact that it had been illegally seized.

*Id.* 95 Pa.Commonwealth Ct. at 416–419, 505 A.2d at 1082–1083.

▇ In applying the balancing approach used in *DeShields* to the facts of the present case, we must conclude that application of the exclusionary rule is unwarranted. The record reveals that Sertik did not attempt to suppress any evidence at the beginning of the Board hearing and never objected to its admission on constitutional grounds. Even assuming *arguendo* that evidence of Sertik's sexual conduct was obtained as a result of unlawful police activity, the School District's interest in its students of relatively tender years and insuring an appropriate school environment far outweighs any deterrent effect on the police, particularly since Sertik was not charged by the police with any offenses.

▇ Furthermore, there is no evidence in the record that Sertik's admissions of sexual activity were involuntary. Sertik signed a waiver of his *Miranda* rights prior to

questioning and had expressly declined to be represented by legal counsel or a union representative before questioning by Mancini, the School District investigator. Reproduced Record (R.R.) at 63a–64a. Sertik did not present any evidence to the Board of duress or coercion that would support a finding that his admissions of sexual activity were involuntary. As a result, we agree with the Secretary that Sertik's statements were voluntary and thus conclude that the evidence of Sertik's sexual activity was properly admitted.

■ Sertik's third contention is that the testimony of the School District's witnesses, regarding his admissions of sexual activity with Tammy during the 1988–89 school year, is uncorroborated hearsay. Consequently, Sertik contends that his statements cannot be used as a basis for the Board's adjudication since he later denied any sexual activity with Tammy prior to her graduation. We disagree. Clearly, Sertik's testimony was admissible under the party admission exception to the hearsay rule. Sertik's right to cross-examination was not lost and he was free to take the witness stand. *See DeFrancesco v. Western Pennsylvania Water Company*, 329 Pa.Superior Ct. 508, 520–521, 478 A.2d 1295, 1302 (1984).

■ Finally, we note that Sertik does not challenge the Secretary's decision affirming his dismissal on the grounds of his violation of the School District's policies regarding: the transportation of students; "folksiness" with selected students; and having amorous relationships with students. Section 1122 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. § 11–1122 permits a professional employee to be terminated for, *inter alia,* willful violation of the school laws. Because a violation of the school laws includes a violation of a school district's rules and orders, *Harris v. Secretary of Education*, 29 Pa.Commonwealth Ct. 625, 632, 372 A.2d 953, 957 (1977), the Board did not err.

Accordingly, we affirm the order of the Secretary.

## ORDER

AND NOW, this 12th day of December, 1990, the order of the Secretary of Education in the above-captioned proceeding is affirmed.